**Tommie E. WATKINS, et al.,**
**Plaintiffs-Appellants,**

**v.**

**Donald BLINZINGER, et al.,**
**Defendants-Appellees.**

**Dorothy DAVIS, et al.,**
**Plaintiffs-Appellants,**

**v.**

**Gregory COLER, et al.,**
**Defendants-Appellees.**

Nos. 85–2366, 85–2481.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 21, 1986.

Decided April 18, 1986.

Rehearing and Rehearing En Banc in No. 2366 Denied May 12, 1986.

Donald R. Lundberg, Legal Organization of Indiana, Indianapolis, Ind., for Watkins.

Gary L. Shaw, Dep. Atty. Gen., Indianapolis, Ind., James R. Goeser, Dept. of Health & Human Service, Chicago, Ill., for Blinzinger.

John M. Bouman, Beverly V. Groudine, and Barbara Stob, Legal Assistance Foundation, Chicago, Ill., for Davis.

Steven Hogroian, Owen M. Field, and James C. O'Connell, Special Asst. Attys. Gen., Chicago, Ill., for Coler.

Before BAUER, WOOD and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

Recipients of Aid to Families with Dependent Children (AFDC) are dropped from the program if their incomes exceed the "standard of need" in their states. They also are dropped if their "resources" exceed $1,000. A person who receives a lump-sum payment wants to have the payment called a "resource" rather than "income."

If the lump sum is a "resource," the recipient may spend it as he pleases; once cash on hand and other valuable assets dwindle to less than $1,000, the person will be restored to the rolls. If the lump sum is "income," however, it must be budgeted.

Under 42 U.S.C. § 602(a)(17), the state's welfare officials divide the lump sum by the monthly "standard of need." See also 45 C.F.R. § 233.20(a)(3)(ii). The quotient gives the number of months the person will be ineligible for aid. For example, if a person receives $20,000, and the monthly standard of need is $500, the state will divide $20,000 by $500, producing a quotient of 40. The recipient will be ineligible for AFDC for 40 months. This method treats the lump sum as if the amount of the "standard of need" had been received as monthly income during the months following receipt of the lump sum.[1] A recipient who spends a lump sum classified as "income" and becomes destitute remains ineligible for the program nevertheless, while if the lump sum had been called a "resource" eligibility would have been restored.

We have consolidated two cases presenting the question whether lump sums that compensate victims for personal injuries are "income" or "resources" for purposes of AFDC. *Watkins v. Blinzinger* is a challenge to Indiana's implementation of the AFDC program, *Davis v. Coler* a challenge to Illinois's. Both states have chosen to treat lump sum payments attributable to personal injuries as "income," an option that the Department of Health and Human Services contends states possess.[2] Both cases were filed as class actions on behalf of all AFDC recipients who have received or will receive lump-sum payments on account of personal injuries.[3] Both courts

---

1. The system gives the recipient the benefit of the interest that may be earned from the lump sum. If $20,000 is invested at 10% and drawn down at a level rate over 40 months, it will produce $590 per month. If a $20,000 fund invested at 10% is tapped for $500 a month, it will last for almost 49 months. The regulations disregard this complication, as do we.

2. The Department has proposed a regulation that would require states to treat all lump sum payments as "income." See the proposed amendment to 45 C.F.R. § 233.20(a)(3)(iv)(E), published for comment at 49 Fed.Reg. 45561, 45567–68 (1984). It has not yet adopted this regulation, however, and its briefs take the position that until it does, the states·may elect to treat lump sum payments as income or resources at their option.

3. Despite Fed.R.Civ.P. 23(c)(1), which requires a decision on the application for certification of the class "[a]s soon as practicable after the commencement of an action brought as a class action", neither district court addressed the motion for certification until it had granted summary judgment to the defendants. Each court then declined to certify the class. The district court in Illinois refused to rule on the motion for certification, and the district court in Indiana denied the motion without stating reasons. Neither is an appropriate procedure. The decision on certification should be made quickly. Both sides have an interest in prompt certifica-

sustained the states' positions, concluding that the states and the Secretary of Health and Human Services have discretion to treat such payments as either income or resources. *Watkins v. Blinzinger*, 610 F.Supp. 1443 (S.D.Ind.1985); *Davis v. Coler*, 601 F.Supp. 444 (N.D. Ill.1984). *Watkins* also rejected the plaintiffs' request for a declaratory judgment that until 1983 Indiana had been violating § 602(a)(17) by dividing the lump-sum payment by the portion of the "standard of need" (90%) that the state customarily paid to AFDC households, rather than by the "full" standard of need. The district court concluded that because Indiana had switched to the use of the "full" standard of need, the claim was moot. We discuss this in Part II below.

I

There has been a good deal of litigation about the treatment of personal injury awards. *Reed v. Health and Human Services*, 774 F.2d 1270 (4th Cir.1985), pet. for cert., 783 F.2d 454 (4th Cir.1986), the only appellate decision on the question, holds that lump sum payments for personal injuries must be treated as "resources." The district courts are divided. *Jackson v. Guissinger*, 589 F.Supp. 1288 (W.D.La. 1984), and *Betson v. Cohen*, 578 F.Supp. 154 (E.D.Pa.1983), rev'd on other grounds sub nom. *Barnes v. Cohen*, 749 F.2d 1009 (3d Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 2126, 85 L.Ed.2d 490 (1985), like the two cases we have on appeal, hold that

states may treat personal injury awards as income. *LaMadrid v. Hegstrom*, 599 F.Supp. 1450 (D.Ore.1984); *White v. Rahm*, No. C85–007T (W.D.Wa. Apr. 20, 1985); and *Payne v. Toan*, 626 F.Supp. 553 (W.D.Mo.1985), come out the other way. We disagree with these cases and with *Reed.*[4] The language and legislative history of § 602(a)(17) allow the states and the Secretary to define "income," and therefore Illinois and Indiana were entitled to treat compensation for personal injury as "income."

The statute uses the word "income" but does not define that word. We must look elsewhere for help. Start with the obvious. Money paid to compensate people for personal injuries is income in a fundamental sense. It may be spent. It is no different from money received as wages, though as we discuss later it is usually not taxable. Much of the value of an award may represent lost wages, past and future. Whoever computes the award will start with the reduction in earnings, discount this to present value, and award that sum to the injured person. *O'Shea v. Riverway Towing Co.*, 677 F.2d 1194 (7th Cir.1982). That the injured person receives his future wages all at once through the award rather than in weekly installments over the course of a lifetime does not change the character of the money.

An award may have other sources, too—compensation for pain and suffering, for mutilation, for property damage, for emo-

---

tion. To the extent the district courts thought certification unnecessary once they had ruled for the defendants, they were mistaken. *Vickers v. Trainor*, 546 F.2d 739, 747 (7th Cir.1976). A deferred ruling converts the class action to an opportunity for one-way intervention, which Rule 23 is designed to avoid. *Roberts v. American Airlines, Inc.*, 526 F.2d 757, 762 (7th Cir. 1975), *cert. denied*, 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976). The defendants have an interest in obtaining the preclusive effect of a certification, which prevents members of the class from bringing the same suit later on. The plaintiffs, who may appeal the denial of relief, also have an interest in knowing whether the

stakes on appeal include the interests of the whole class. Nonetheless, the defendants have not asked us to remand for certification of the classes to obtain a broader preclusive effect in the event we affirm, so we shall not discuss the question further.

4. Because this opinion creates a conflict among the circuits, it was circulated to all judges in regular active service. See Circuit Rule 16(e). No judge requested rehearing en banc concerning the definition of "income" under § 602(a)(17).

tional injury, for medical expenses. To the extent these reflect loss in future market opportunities, they are the same as a replacement of future earnings. The loss of a limb, for example, may reduce potential earnings, and the award for the loss therefore is a substitute for these earnings. The other bases of personal injury awards are less closely tied to the employment market, and plaintiffs urge us to treat these sources, indeed the whole award, as "compensation" rather than "income"—as an even trade for the loss of one's body or an injury to one's psyche. What makes one whole is not gain, and without gain there can be no income.

This is wrong as a statement of legal life. Suppose a person bought a painting for $50,000 in 1970 and sold it for $100,000 in 1985. During these 15 years the cost of living rose by more than 100%; the increase in the price of the painting did not keep pace with the reduction in the value of money. The painting's owner is poorer with $100,000 in 1985 than he was with a $50,000 painting in 1970. As an economic matter he has suffered a loss. Yet as a legal matter he has received $50,000 in "income," on which he must pay tax at the capital gains rate. The law looks to the receipt of money, not to the existence of economic gain. (We discuss below the extent to which this exchange would yield a "resource" in the AFDC program.)

The point may be plainer if we consider how anyone earns wages. To earn money a person must sell a little bit of himself. He sells time, and with it the right to engage in leisure; sometimes he sells his health (by working in a place with contaminants) or his body (by working in a place with physical risks). In exchange for giving up these things, he receives a wage. Over the course of a lifetime this will wear him down. Time and labor wear us all down. Is the wage "gain," or is it just "compensation" for the time, the labor, the risk of injury, that goes with work? The inquiry is metaphysical, the answer arbitrary. The answer of the tax system is that the wage is "income;" the answer of the tax protester is that the depreciation of

the person (a wasting asset) exactly offsets the wage, and so there is no income. The plaintiffs in this case have taken the tax protesters' view of income, as only the excess of receipts over the costs borne to obtain those receipts.

The plaintiffs also say that pain and suffering is different, clearly not a substitute for earnings. Even here, though, things are not so clear. Football players sacrifice their bodies (they "play with pain") to perform their jobs. They trade pain for income. People sell parts of their bodies (blood and kidneys) for money. See Susan Rose-Ackerman, *Inalienability and the Theory of Property Rights*, 85 Colum.L. Rev. 931, 945–49 (1985) (collecting sources). What they get in return is "income." *United States v. Garber*, 607 F.2d 92, 102–05 (5th Cir.1979) (en banc) (dissenting opinion; the majority reversed a conviction because of improper instructions on wilfulness without resolving this question). People may participate in experiments in which they receive electrical shocks for incorrect answers, or they may take new drugs. Here, too, they receive income in exchange for the pain or the risk of ill health.

All of this is not to say that compensation for lost wages, or for pain, *must* be deemed "income." "Income" is a legal construct rather than an economic truth; there is no natural meaning of a legal construct. The tax law has things both ways. It defines almost every receipt of money as income, see 26 U.S.C. § 61, and then establishes special exclusions for damages, see 26 U.S.C. § 104. The definition of income in § 61 includes damages representing income of every kind, see *United States v. Safety Car Heating & Lighting Co.*, 297 U.S. 88, 93–94, 56 S.Ct. 353, 356, 80 L.Ed. 500 (1936), though it does not cover a replacement of "capital." Section 104(a)(2) then allows exclusion of damages received "on account of personal injuries or sickness". Section 104(a)(3) establishes still another rule for sums received through accident or health insurance (which may cover the same losses): these proceeds are excludable to the extent the taxpayer pur-

chased the insurance with taxable income, but the proceeds are taxable income if the insurance is "attributable to contributions by the employer which were not includible in the gross income of the employee".[5] This is not a line based on logic; it is a practical compromise. So, too, is any other working definition of "income." Should "income" be defined as all receipts, and then reduced by deductions and exclusions? The Internal Revenue Code takes this position; it could equally well have provided that all costs and expenses must be subtracted from gross receipts to produce the definition of "income."

The Secretary of Health and Human Services has recognized the arbitrary quality of any definition of "income" by allowing states (so far) to treat personal injury awards as income or not, at their option. This is certainly permitted by the analogy to the Internal Revenue Code, which defines "income" as gross receipts rather than net gain. See also *Heckler v. Turner*, —— U.S. ——, 105 S.Ct. 1138, 84 L.Ed.2d 138 (1985), which holds that in calculating income under the AFDC program the Secretary may look to gross receipts, rather than to receipts less the expenses the recipient incurs in producing the income. (These costs are handled by a fixed "disregard" rather than deducting the actual costs of producing the income.)

To the extent the definition of income is a matter of logic, there is support for either treatment. When there is support for either treatment, the decision of the Secretary and the states must prevail. *United States v. Riverside Bayview Homes, Inc.*, —— U.S. ——, 106 S.Ct. 455, 461–62, 465, 88 L.Ed.2d 419 (1985); *Chemical Manufacturers Ass'n v. Natural Resources Defense Council, Inc.*, —— U.S. ——, 105 S.Ct. 1102, 1108, 1112, 84 L.Ed.2d 90 (1985); *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984); *American Paper Institute*,

*Inc. v. American Electric Power Service Corp.*, 461 U.S. 402, 423, 103 S.Ct. 1921, 1933, 76 L.Ed.2d 22 (1983) (if the interpretation is "*a* reasonable interpretation of the relevant provisions" it must be sustained). The Secretary has a general power of superintendence, and his treatment should be accepted unless beyond the pale of reasonableness. The Secretary's treatment is especially useful when, as here, he had a hand in drafting the legislation (on which more below) and offered a contemporaneous construction. See *Miller v. Youakim*, 440 U.S. 125, 144, 99 S.Ct. 957, 968, 59 L.Ed.2d 194 (1979); *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965).

All welfare legislation depends on the interaction of the definition of income, the guaranteed level of support, and the rate at which support is withdrawn as income rises. States largely control the standard of need and the degree to which more income leads to a reduction in support. See *Heckler v. Turner, supra*, 105 S.Ct. at 1142 & n. 3. It is not possible for a court to change one of these variables without affecting all. Because AFDC is a program of cooperative federalism, and because states control most of the important variables, the Secretary's position that the states also may include or exclude certain items from the definition of "income" is entitled to considerable respect. If the Secretary (or a court) forced a state to exclude an item from income, it might respond by reducing the payments to all recipients of AFDC. A court should require such a revamping of the program only if the legislation at hand leaves no alternative.

The question, then, is whether Congress left the Secretary and the states but one option—to treat personal injury awards as "resources." The language of the statute offers no help. The plaintiffs rely on the legislative history, but this turns out to be no more illuminating. Section 602(a)(17)

**5.** The Fourth Circuit's decision in *Reed* rested in part on a conclusion that damages awards are not "income" under § 104. See 774 F.2d at 1274. This is a misunderstanding of the Code.

The awards are income by virtue of § 61 and excluded from taxation, in part, by virtue of § 104.

was § 2304 of the Omnibus Budget Reconciliation Act of 1981 (OBRA).[6] OBRA was a Christmas-tree bill amending scores of laws in pursuit of fiscal savings. Until § 602(a)(17) was enacted, a recipient of a lump sum would become eligible for AFDC again as soon as he had spent the money. The Secretary drafted new language, which became § 602(a)(17), and proposed it to Congress as a method to induce recipients of AFDC to conserve nonrecurring receipts—and not incidentally to reduce the costs of the AFDC program. Congress enacted § 602(a)(17) exactly as the Secretary proposed it.

The Senate Committee on Finance approved the proposal with the remark: "[L]ump-sum payments should be considered available to meet the ongoing needs of an AFDC family. The present treatment of such payments has the perverse effect of encouraging the family to spend such income as quickly as possible in order to retain AFDC eligibility. The committee amendment would require that such income received in a month be considered available as income in the month that it is received and also in future months.... [A]ny amount of income that exceeds the initial month's needs standard would be divided by the monthly needs standard, and the family would be ineligible for aid for the number of months resulting from that calculation." S.Rep. No. 97–139, 97th Cong., 1st Sess. 505 (1981), U.S.Code Cong. & Admin.News 1981, pp. 396, 771. In another section of the report the Committee used "retroactive social security benefits" (id. at 436, U.S.Code Cong. & Admin.News at 702) as the sole example of the sort of lump-sum payments that would be considered "income." A summary by the staff of the pending proposals states the effect of the change this way: "Require that large payments, together with other income remaining after the application of disregards, be

considered to meet ongoing needs in the AFDC program...." Committee on Finance, Staff Report, "Proposals for Reduction in Spending Programs," Part I, at 33 (Committee Print 1981). The committee in the House also endorsed the Secretary's proposal but did not discuss the subject separately in its report. A section-by-section analysis of the Secretary's proposal appended to the House report explains that the proposal would "[r]equire States to consider all lump-sum payments as income available to meet a family's needs. ... Any excess sum in the month when received would be carried forward for later use." Committee on Ways and Means, Staff Report, "Description of the Administration's Legislative Recommendations," at 53 (Committee Print 1981).

The plaintiffs allow that the states' definition of "income" is consistent with the purpose of the legislation. The more receipts are defined as "income," the more recipients of AFDC will be induced to conserve and budget their funds, and the less the AFDC program will pay out. Yet the plaintiffs also observe, accurately, that the legislative history does not define the "income" that is subject to the budgeting rule of § 602(a)(17). The staff summaries in both House and Senate say that the language applies to all "large payments" (Senate staff) or "lump-sum payments" (House staff), which implies that damages awards from personal injuries must be "income." But the words of the staff are not the equivalent of statements in committee reports, and the implication that all lump-sum payments are income may be inadvertence rather than considered conclusion. The subject was simply not under discussion.

The statements of the Secretary are a little more useful, but also not conclusive. For example, the Secretary's message of

---

**6.** There have been two amendments since 1981. A change effective July 18, 1984, inserted "earned or unearned" before "income" to make it clear that all sources of income must be budgeted. A further change effective October 1, 1984, established that the statute applies to all people receiving AFDC benefits and not just

those who had other earned income. See § 2632 of the Deficit Reduction Act of 1984, Pub.L. 98–369. Neither of these changes affects the structure of § 602(a)(17), which for purposes of this case we may take as the product of OBRA alone.

May 5, 1981, transmitting his proposals to Speaker O'Neill contains much language about the benefits of inducing the budgeting of "large payments," but the Secretary did not offer a definition of income. The Secretary's summary of the draft bill states in part: "Under current law, there is no way to assure that large payments, such as lump-sum payments of insurance proceeds, or retroactive benefit payments, are considered available to meet current needs over a period of time, even though the family eligibility can be curtailed for the month of receipt. The proposal would specify that these large payments, together with other income remaining after application of the disregards, would be considered as income ..." Transmittal of Secretary Schweiker to Speaker O'Neill at 10–11. The Secretary's testimony explaining the proposal offers another illustration but still no definition. The testimony states: "When a large amount of money is received as a lump sum—for example, an inheritance—we will consider it as income available for support not only in the month it is received but to meet future needs." Secretary Schweiker's prepared statement before the Senate Committee on Finance, at 18. Again the Secretary invites us to infer from the examples of insurance proceeds, retroactive payments of benefits, and inheritances, that *all* large lump sums are "income"; again the plaintiffs properly respond that the Secretary never said this, and that each of these three illustrations could be distinguished from awards of damages for personal injuries. Inheritances are "gain" by plaintiffs' lights; retroactive payments of, say, workers' compensation benefits are wage-substitutes; insurance proceeds could be from kinds of insurance other than disability.

The inescapable fact is that Congress wanted to compel recipients of AFDC to budget lump-sum receipts of "income" but did not consider what "income" might be. Perhaps the Secretary and many Members of Congress assumed that all lump sums are "income," but this was not the subject of debate or decision. The most that can be said is that Congress did not prescribe any restriction on the definition. Any definition that includes particular lump sums within the catgory "income" is consistent with the purpose of § 602(a)(17) to reduce the incentive to spend large receipts quickly. Because the Secretary has the discretion to define income in any way consistent with the will of Congress, this is enough support for his position.

The plaintiffs have two final lines of argument. One is that because Congress did not *change* the definition of "income" in 1981, the Secretary should have stuck with the approach in force in 1981, which would have classified personal injury awards as "resources." The other is that the Secretary must be consistent in defining resources, and that because a regulation defines the receipts from the sale or exchange of a resource as a resource, the Secretary also must define personal injury awards—the equivalent of receipts from the sale or exchange of the AFDC recipient's person—as resources.

The Fourth Circuit was persuaded in *Reed* that "income" means only net gain, and that because Congress did not change this meaning in 1981 damages awards cannot be income. 774 F.2d at 1275. We have discussed above the reasons why "income" may mean gross receipts as easily as it means net gain. The Supreme Court in *Heckler v. Turner* used gross receipts as the meaning of income for purposes of AFDC, and there is no reason why damages on account of personal injury should receive a different treatment. See also, e.g., *Walker v. Adams*, 741 F.2d 116 (6th Cir.1984) (treating as "income" for purposes of AFDC a payment received as an insurance settlement for the demolition of a car). The plaintiffs reply that the Secretary himself has treated personal injury awards as "resources" since 1957, when a "Handbook of Public Assistance Administration" informed states that they must treat as "income" any lump sum that represents "accumulated current income." This meant, the Handbook said, that Social Security benefits and workers' compensation benefits are "income" even if paid in lump

sums. According to the plaintiffs, however, the Handbook told states to treat as "resources" compensatory payments for the loss of a hand or foot. This means, plaintiffs conclude, that all recoveries for personal injuries must be "resources."

The Handbook is not as clear as the plaintiffs portray it, however. It says only that payment for the loss of a hand or foot "might" be a resource.[7] The Handbook leaves this decision to the state. Perhaps more interesting, it instructs states to treat accumulated workers' compensation payments—an administrative substitute for awards of damages—as "income." So, too, disability payments under the Social Security system, still another means of compensation for personal injuries, are unquestionably "income" for purposes of AFDC. All in all, this Handbook supports the Secretary more than it supports the plaintiffs. The plaintiffs also rely on briefs attempting to summarize the Secretary's policy. These are not useful guides; the Secretary's handbooks and regulations, not the efforts of lawyers to summarize them, create the agency's policy. Cf. *SEC v. Chenery Corp.*, 318 U.S. 80, 94–95, 63 S.Ct. 454, 462, 87 L.Ed.2d 626 (1943).

The plaintiffs' final ground, tracking the Fourth Circuit, is that states must treat like things alike. The Secretary has promulgated an "equitable treatment" regulation, 45 C.F.R. § 233.10(a)(1), to this end. Both Illinois and Indiana treat as a "resource" cash from the sale or exchange of another "resource." So, for example, if a family sells its refrigerator and receives $100, that money is a "resource." So, too,

if the family's car is wrecked and the family receives insurance proceeds, those proceeds are a "resource." The Fourth Circuit concluded that the disparity between the treatment of the replacement of "resources" and the treatment of damages awards—which it saw as just another receipt for the sale or exchange of an asset, one's person—violated the equitable treatment rule of § 233.10(a)(1). 774 F.2d at 1275.

This reasoning is circular, however. The rule treating as a "resource" the proceeds of the sale or exchange of a "resource" treats likes alike. A household that has the $100 rather than the refrigerator is little different from the household with the refrigerator and no cash. The family still has less than $1,000 in assets. Because the exchange does not change the family's command over real resources, it does not occasion a change in eligibility for AFDC—whether or not the family chooses to use the $100 to buy a new refrigerator, or the insurance proceeds to buy a new car. (If the exchange produced a gain, the family must "spend down" to $1,000 again.) The question in this case is *whether* the receipt of damages for personal injury is a mere exchange of one asset for another. A person who has "exchanged" pain and suffering for cash has greater market opportunities at his disposal; he can use the cash to improve his position. We assume that the "equitable treatment" regulation does not require wages to be treated as "resources" on the ground that the worker "exchanges" sweat and time for money. Because most income is produced by exchang-

7. Here is the full quotation: "The [state] agency should make certain that the kind of resources considered 'lump sum' payments are in fact in the nature of a non-recurring sum or a windfall and *not* a resource that represents accumulated current income received in a single sum. For example, the initial [Social Security] payment representing an accumulation of current monthly benefits would not under Bureau policy represent a 'lump sum.' In like fashion, industrial compensation payments representing accumulated weekly or monthly amounts would not be thought of as 'lump sum' payments. On the other hand, a settlement of industrial compensation as the result of loss of hand or foot might represent a 'lump sum' payment." Handbook of Public Assistance Administration, Part IV, S–3120, at 1 (Sept. 7, 1957) (emphasis in original). The passage is hard to understand because of changes in terminology. In 1957 "lump sum" denoted payments that were not counted as income. It is also important to understand that the addressees of this advice were state and local administrators. In current terminology the Handbook told these administrators that they must count accumulated income-substitutes as income, but that they "might" treat compensation for loss of body parts as a resource.

ing something (time, energy, risk of injury) for money, it is not dispositive that *some* kinds of exchanges (refrigerators for money) are not "income." The tax system regularly distinguishes between receipts from the sale or exchange of property (taxed only to the extent price exceeds basis, and some like-kind exchanges are not taxed) and receipts attributable to other sources, such as labor (people have no "basis" in themselves). We do not think a state violates the "equitable treatment" regulation by drawing the same sort of distinction. We have explained above that the Secretary and the states are entitled to treat damages on account of personal injuries as more similar to wages or other gross receipts than to exchanges. It follows that the Secretary and the states need not treat damages awards in the same way they treat the sale or exchange of refrigerators.

Although we have concluded that the Secretary and the states are authorized to treat the award of damages for personal injuries as "income," we do not imply that the exercise of this authority is always desirable. The AFDC program has only two categories, "income" and "resources," and two categories are insufficient to exhaust the variousness of experience. Cf. *Stephens v. Heckler,* 766 F.2d 284 (7th Cir.1985). Awards for personal injuries will represent past and future income in part, punitive damages in part, pain and suffering in part, and medical expenses in part. An approach that sweeps all into "income" overstates the amount of cash that an award makes available to the family, just as surely as an approach that sweeps all into "resources" understates the family's income. Cf. *Schweiker v. Gray Panthers,* 453 U.S. 34, 48, 101 S.Ct. 2633, 2642, 69 L.Ed.2d 460 (1981). Suppose a person receives $20,000, half of which represents lost future wages and half of which represents the present value of medicine that the injured person must use for the rest of his life. Only $10,000 of this award is available to meet household expenses; the rest must be invested and spent on medicine many years hence. If the state requires the family to use the whole $20,-000 for subsistence, which under § 602(a)(17) is the result of calling the whole $20,000 "income," there will be nothing left to buy the medicine. The reply Illinois gave at oral argument—that the state will furnish the medicine without cost to all recipients of AFDC—assumes that a family stays on welfare forever. This is not so, and a state ought not to increase the likelihood of a family's needing to stay on welfare by appropriating to itself the benefits of awards that are designed to cover medical costs.

So the Secretary's definition of income may produce harsh results. It is not an unlawful definition on that account, however, because the result will be unpleasant no matter what. Even if the $10,000 for medicine were called a "resource," the recipient would be disqualified from the AFDC program until he had spent all but $1,000 of the money. So even if the money designated for medicine were called a "resource," as plaintiffs wish, the state still would not allow the recipient to devote the money to its intended purpose. Too, the statute offers routes to ameliorate the harshness of calling everything "income." The AFDC program has a separate limit on the kind of "income" that a recipient must apply toward subsistence. The state must exclude from income a series of "disregards" (discussed in *Heckler v. Turner, supra*) that are proxies for the costs of generating the income. Perhaps an appropriate "disregard" could or must be matched against the portion of an award representing medical expenses. We do not consider this question here, as the parties have not raised it. Moreover, § 2632 of the Deficit Reduction Act of 1984 allows states to shorten the period of ineligibility created by § 602(a)(17) in order to take account of the fact that lump sum payments may cover fixed expenses and so not be available to meet the costs of living. See also the interim implementing regulations, 45 C.F.R. § 233.20(a)(3)(ii)(F), 49 Fed.Reg. 35586, 35591–92 (Sept. 10, 1984). Indiana has exercised its option under § 2632 and excludes from "income" the portion of an

award of damages attributable to medical expenses. In the hypothetical we have given, Indiana would treat only $10,000 of the $20,000 award as income.[8] Illinois represented at oral argument that it has not exercised this option. This may be heartless, but it is not unlawful. To the contrary, the fact that § 2632 gives states an *option* establishes that they may treat as "income" receipts that they could as readily exclude, and that they may disqualify families from the program for lengthy periods when shorter periods would be as satisfactory from Congress' perspective. Whether to treat medical expenses as "income" is a question Congress has committed to the Secretary and the states.

## II

The remaining question concerns Indiana's administration of the lump sum rule before May 12, 1983. Until then Indiana used as the denominator in the § 602(a)(17) formula the portion of the "standard of need" that it paid to AFDC households. To return to the example from the beginning of the opinion, suppose someone in an AFDC household received a lump sum of $20,000, and the "standard of need" for that household was $500 per month. Indiana gives households 90% of their "standard of need." Until May 12, 1983, Indiana would have divided $20,000 by $450 (90% of $500), producing a quotient of 44.44. It therefore would have excluded the family from the program for 44 months. Starting in May 1983 Indiana would have used $500 as the denominator, producing 40 months' disqualification.

When the plaintiffs brought this suit in 1982, they challenged Indiana's method of calculating the period of disqualification. The district judge held: "As the state has discontinued the practice complained of, the

Court finds said issue MOOT." 610 F.Supp. at 1449. Yet "voluntary cessation of allegedly illegal conduct does not moot a case." *United States v. Concentrated Phosphate Export Ass'n, Inc.*, 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968). See also, e.g., *Chicago Teachers Union v. Hudson*, —— U.S. ——, 106 S.Ct. 1066, 1075 n. 14, 89 L.Ed.2d 232 (1986). The case is not moot unless there is reasonable assurance that the questioned conduct will not be resumed. *City of Los Angeles v. Lyons*, 461 U.S. 95, 100–01, 103 S.Ct. 1660, 1664, 75 L.Ed.2d 675 (1983); *Parks v. Pavkovic*, 753 F.2d 1397, 1404 (7th Cir. 1985). The claim of mootness is weak here not only because the state has not pledged to retain the policy it adopted on May 12, 1983, but also because the plaintiffs seek damages on account of the period before May 12. They cannot obtain damages in federal court, in light of the eleventh amendment, *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), but they contend that if the district court should issue a declaratory judgment, the state would be required to afford relief through its administrative processes, neatly avoiding the eleventh amendment. The case therefore depends on an application of the principles of the eleventh amendment, not on a technical claim of mootness.

The eleventh amendment bars the claim. See *Green v. Mansour*, —— U.S. ——, 106 S.Ct. 423, 88 L.Ed.2d 371 (1986); *Granados v. Reivitz*, 776 F.2d 180 (7th Cir.1985). Plaintiffs sued the state officials responsible for administering the AFDC program. These officials did not commit torts or other wrongs against the plaintiffs independent of their implementation of state law, and any judgment would come from the state treasury. This is therefore a prohibited suit against the State of Indiana, unless there is some exception. *In re Ayers*,

---

**8.** The operation of Indiana's policy is illustrated by the case of Gaynel Diamond, one of the representative plaintiffs. She received a payment of $3,302.20 on account of an accident. Of this $1,802.20 was for medical expenses and $1,500 was for pain, suffering, disfigurement, and permanent impairment. The state applied the $1,802.20 toward medical expenses, which

had been paid by Medicaid. It treated only the $1,500 as available for living expenses. This application of the method of § 602(a)(17) produced a disqualification from the AFDC program for five months. (Illinois, too, excludes past medical expenses; the principal difference is that Indiana also would exclude future medical expenses.)

123 U.S. 443, 8 S.Ct. 164, 31 L.Ed. 216 (1887); David P. Currie, *Sovereign Immunity and Suits Against Government Officers*, 1984 Sup.Ct.Rev. 149. Plaintiffs claim the benefit of *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), which held that a federal court may grant an injunction (and by implication a declaratory judgment) against a state official administering a program in violation of the constitution or federal law. The official is treated for a limited purpose as "not the state", and so the eleventh amendment does not apply. As the Supreme Court has recently explained *Young*, however, the case does not establish that an official is "not the state" just because the plaintiffs do not seek monetary relief. *Young* is limited, rather, to the award of remedies "designed to end a continuing violation of federal law [and] necessary to vindicate the federal interest in the supremacy of that law." *Green, supra,* 106 S.Ct. at 426. See also *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 102–03, 114 n. 25, 104 S.Ct. 900, 909, 915 n. 25, 79 L.Ed.2d 67 (1984). When there is "no ongoing violation of federal law" (*Green, supra,* 106 S.Ct. at 425), a suit against a state officer—a suit the decision of which will as a practical matter bind the state—should be treated for what it is: a suit against the state. The Supreme Court accordingly held in *Green* that when there is no ongoing or impending violation of federal law, a federal court may not issue declaratory or "notice" relief, even though that relief would be "prospective" and would not require payments from the state treasury.

Plaintiffs seek to avoid this conclusion by arguing that *Young* continues to apply unless the claim based on federal law is moot, as it was in *Green* and in *Granados* (a decision of our court anticipating *Green*). This has things backwards, however. The rule of the eleventh amendment, as the Supreme Court has construed that amendment, is that federal courts may not entertain suits against the states. *Young* is a narrow and somewhat anomalous sidestep, designed to permit the vindication of what the Court sees as the paramount interest in the application of the constitution and federal law to continuing or impending conduct. When the federal interest is no longer so pressing—when there is no continuing conduct that states must change to comply with federal law—the reason for the rule of *Young* no longer applies. When the reason no longer applies, neither does the rule, as *Pennhurst* and *Green* hold. It is therefore not important that the underlying claim in *Green* was moot (but for the possibility of notice relief and damages in state court), while the underlying claim here is not moot. This case shares the important feature of *Green:* there is no ongoing violation of federal law. *Young* does not apply, and the eleventh amendment bars further proceedings in federal court.

It is not important that the plaintiffs seek a declaratory judgment rather than an injunction. The plaintiffs in *Green* also sought declaratory relief. The Supreme Court concluded that it is not an appropriate exercise of discretion to issue a declaratory judgment when it is requested for the sole purpose of binding the state and, perhaps, compelling the state to award damages in state court. The judgment in *Green* would have been useful only in setting the stage for further relief. Because "the issuance of a declaratory judgment in these circumstances would have much the same effect as a full-fledged award of damages or restitution by the federal court, the latter kinds of relief being of course prohibited by the Eleventh Amendment" (*Green, supra,* 106 S.Ct. at 428), the Court held declaratory relief unavailable. It is unavailable in this case for the same reason.

The plaintiffs may have a good claim in state court, to which the eleventh amendment does not apply. We do not pass on the merits of their challenge to the state's policy before May 12, 1983. We hold only that the federal court does not have the authority to adjudicate a challenge to a state policy no longer in effect.

AFFIRMED.