**HAROCO, INC., et al., Plaintiffs,**

v.

**AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO, et al., Defendants.**

**No. 83 C 1618.**

United States District Court, N.D. Illinois, E.D.

June 2, 1987.

Aram A. Hartunian, Hartunian, Futterman & Howard, Chicago, Ill., for plaintiffs.

Don H. Reuben, Robert W. Tarun, Katherine E. Rakowsky, Isham, Lincoln & Beale, Chicago, Ill., for defendants.

## MEMORANDUM AND ORDER

MORAN, District Judge.

Haroco, Inc., Roman Ceramics, Inc., California Originals, Inc., and Mike Lane Distilled Products Co. filed their first complaint against American National Bank and Trust Company of Chicago ("ANB"), Walter E. Heller International Corporation ("Heller"), and Ronald J. Grayheck in March 1983. The original complaint included claims under the Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO"), 18 U.S.C. §§ 1961 *et seq.*, and pendent state claims. The Seventh Circuit reversed the order dismissing that complaint and the Supreme Court affirmed the Seventh Circuit. *Haroco, Inc. v. American National Bank & Trust Co.*, 747 F.2d 384 (7th Cir.1984), *aff'd*, 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985).

After remand, plaintiffs amended their complaint twice. The third amended complaint consists of six counts. Counts I, II and III contain plaintiffs' RICO allegations; count IV consists of breach of contract claims. In count V plaintiffs allege violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, Ill.Rev. Stat. ch. 121½, ¶ 261 *et seq.*, and in count VI they allege breaches of fiduciary duty. ANB is named as a defendant in all six counts. Grayheck, ANB's president, is named as a defendant only in count I; Heller is no longer a defendant in this action. Plaintiffs brought all six counts on their own behalf and on behalf of an as yet uncertified class of ANB borrowers.

This case was originally assigned to Judge Decker. On defendants' motion to dismiss the third amended complaint Judge Decker ruled that count I failed to state a claim against ANB and count VI failed to state a claim at all. The motion to dismiss was denied in all other respects. *Haroco, Inc. v. American National Bank & Trust Co.*, 647 F.Supp. 1026 (N.D.Ill.1986). The case was subsequently reassigned here.

Three motions are now pending in this case. Defendants have moved for summary judgment. Plaintiffs have moved for an order to compel discovery and for an order setting a briefing schedule on their motion to certify the class. The parties strenuously disagree over which motions can or should be decided first. The court agrees with defendants that their summary judgment motion can be granted now, and that motion is granted. Plaintiffs' motions are denied.

## I. Background

In the late 1970s, when interest rates were fluctuating rapidly, large corporate borrowers began obtaining money directly in the marketplace rather than from banks. To maintain or attract their best customers many banks began looking for new alternative pricing mechanisms for large loans. Banks which had previously lent to such customers at their prime rate, which was

then the bank's lowest rate, began offering better rates to their best customers. Plaintiffs assert that ANB also began offering its best customers better rates, loaning them funds below its announced prime rate.

According to the complaint, ANB failed to disclose this practice to its other customers. Instead, ANB continued to represent in the loan contracts that the announced prime rate was the rate charged "to its largest and most creditworthy commercial borrowers for 90–day unsecured commercial loans." Thus, for example, borrowers getting loans at one point over prime, *i.e.*, borrowers who thought the interest rate on their loan was only one point more than that charged to ANB's best customers, were really paying several points more than the bank's actual prime rate. Plaintiffs charge that this practice was fraudulent and a breach of their loan agreements. They are not the first borrowers to make such a claim against a bank. *See NCNB Nat'l Bank v. Tiller*, 814 F.2d 931 (4th Cir.1987); *Kleiner v. First National Bank*, 581 F.Supp. 955 (N.D.Ga.1984).

## II. Defendants' Motion for Summary Judgment

The named plaintiffs are related corporations [1] which collectively borrowed several million dollars from ANB between 1979 and 1981. Each loan was governed by an agreement that stated the interest on the unpaid principal would be

___ percent above [ANB's] prime rate, which rate shall change when and as said prime rate changes. [ANB] is not obligated to give notice of such fluctuations. The term "prime rate" means the rate of interest charged by [ANB] to its largest and most creditworthy commercial borrowers for 90–day unsecured commercial loans.

The critical allegation in plaintiffs' complaint is that ANB calculated, demanded and collected interest on such floating rate loans based on a declared prime rate that was higher than ANB's actual prime rate.

Defendants raise only one argument on their motion for summary judgment. They maintain that during the period in which plaintiff had floating rate loans outstanding, only an insignificant number of ANB's 90–day unsecured commercial loans were made at rates less than ANB's declared prime rate. ANB asserts that it did not intentionally make those loans at a lower rate and it submits affidavits from several of its loan officers to support that assertion. Defendants contend that because the alleged discrepancy between ANB's declared prime rate and its actual prime rate did not exist, the named plaintiffs paid interest at the agreed upon rate and all of their individual claims fail.

During the discovery conducted so far in this action defendants have produced some 12,500 documents from ANB's commercial loans division. They claim that these documents constitute the loan registers and data entry sheets for all of the 90–day unsecured commercial loans which ANB made or participated in between February 15, 1979 and March 18, 1982. Defendants' summary judgment motion depends on their analysis of these documents. The documents show that ANB made 579 90–day unsecured commercial loans of $500,-000 or more [2] during that period. Of the 579 loans, 307 (53.0%) were made at an interest rate higher than ANB's announced prime rate on the effective date of the loan. Of the remainder, 264 (45.6%) were made at an interest rate equal to ANB's announced prime rate. Only 8 (1.4%) were made at a

---

1. Harold Roman is an officer, director and sole owner of Haroco, Inc. Roman Ceramics, Inc., California Originals, Inc., and Mike Wayne Distilled Products Co. (presently known as Roman Distilled Products, Inc.) are wholly-owned subsidiaries of Haroco, Inc., and Harold Roman has been a director of all four companies at all relevant times.

2. The contractual definition of prime rate refers to the interest rate ANB charged its "largest and most creditworthy commercial borrowers" on such loans. ANB considers its largest and most creditworthy borrowers to be those who can and do obtain loans of $1 million or more (Grayheck aff. ¶ 6). Defendants' analysis is therefore somewhat overinclusive.

rate lower than ANB's announced prime rate.[3]

Defendants contend that the eight loans made at less than ANB's announced prime rate were the result of anomalies in its loan issuance and review process. In four cases, the discrepancy was due to rapid or unexpected changes in ANB's announced prime rate. Two of the loans were issued earlier in the day on a day during which ANB announced an increase in its prime rate (McKinnon aff. ¶¶ 8–9; Metzger aff. ¶¶ 4–5). The interest rates on those loans were intended to be at ANB's announced prime rate, and in fact they reflect the prime rate in effect before the increase was announced. Similarly, two loans were issued at the interest rate quoted by a loan officer seven to ten days before the effective date of the loan (Bobins aff. ¶¶ 4–9). The quoted rate reflected ANB's announced prime rate at the time, but the announced prime rate increased before the effective date of the loan. ANB and its loan officer honored the rate quoted despite the increase.

In three cases, the discrepancy was due to some kind of mistake. Two loans were intended to be made at ANB's announced prime rate, but the interest rate shown on ANB's data sheet is 0.25% lower (McKinnon aff. ¶ 24–5, 10–11). Defendants maintain that this reflects human error by coding personnel. Another loan was mistakenly listed as a 90–day unsecured commercial loan, when in fact it was part of a two-year interim construction financing grid note (McKinnon aff. ¶ 7).

For the one remaining loan, defendants explain that the borrower had negotiated an option to borrow at the London Interbank Offer Rate (LIBOR) (McKinnon aff. ¶¶ 12–13). The borrower exercised that option to secure a $1 million loan at 15.00% when ANB's announced prime rate was 15.75%. Plaintiffs contend that this is precisely the kind of conduct they are complaining about—ANB deliberately offering to lend money to certain customers at interest rates below its announced prime rate. However the defendants further explain

that under the LIBOR option, the borrower is locked into a fixed interest rate for a fixed period of time, and has no prepayment privileges. Therefore, according to the defendants, money borrowed under such an option is not a "90–day unsecured commercial loan" as that phrase is used in plaintiffs' loan agreements.

■ Defendants argue that they are entitled to summary judgment because the alleged scheme to defraud borrowers by calculating interest based on an inflated announced prime rate did not exist. The materials produced so far show that of the 579 loans defendants claim are relevant here, 571 were made at interest rates at or above ANB's announced prime rate. Defendants contend that no reasonable trier of fact could infer that the alleged scheme existed based on the eight loans ANB made at less than its announced prime rate between February 15, 1979 and March 18, 1982, and the court agrees. Unless there is something wrong with defendants' analysis, they are entitled to summary judgment.

Plaintiffs' response is in large part a contention that they should not have to respond because needed discovery has been stalled. Clear it is that defendants have not been eager to engage in expensive discovery when they believe that an early termination on the merits is appropriate. In determining that plaintiffs have not shown that a genuine issue of material fact exists for trial, the court relies, therefore, not only upon what defendants have presented, but also upon what plaintiffs contend they believe they can establish by discovery and upon the absence of certain proofs which plaintiffs could have presented without discovery.

Plaintiffs contend that defendants' analysis is inconclusive (1) because it improperly excludes certain kinds of loans and (2) because it is improperly limited to the three-year period in which the named plaintiffs held floating rate loans. Turning to plaintiffs' first contention, the documents produced so far were selected based on ANB's

---

**3.** These figures are drawn from an affidavit submitted by Michael W. Travers, a paralegal employed by defendants' counsel, and several exhibits attached to that affidavit.

definition of "90–day unsecured commercial loans." According to the affidavit submitted by Mr. Grayheck, "90–day" loans are generally understood in the banking industry to be loans on which the principal must be repaid on a date between the 88th and 92nd day after the loan was made, but which may be repaid earlier without the bank's consent (*i.e.*, there is a prepayment privilege) (Grayheck aff. ¶ 9). "Unsecured commercial loans" are loans to an entity (i) for use in its ordinary and usual business, trade, profession or calling, (ii) that provide prepayment privileges, and (iii) that are not secured by any assets of the borrower (Grayheck aff. ¶ 9). The criteria used to implement this definition in selecting the appropriate documents are described in an affidavit submitted by John Augustine, one of ANB's managers.

Plaintiffs argue that nothing in the phrase "90–day unsecured commercial loans" justifies excluding loans prohibiting prepayment and imposing penalties for early payment in calculating ANB's actual prime rate. Defendants admit in their memoranda that documents pertaining to such loans were excluded from the production and analysis (reply mem. at 5). Defendants also admit that they failed to produce or analyze documents pertaining to loans from ANB's International Division, in part because the only commercial loans made through that division do not have prepayment privileges.[4] Plaintiffs contend that because information about these loans is relevant in determining ANB's actual prime rate, ANB's analysis is inconclusive and their motion is premature. They maintain that summary judgment against them will be inappropriate until documents concerning those loans are produced and analyzed.

Nothing in the contract itself excludes loans without prepayment privileges from ANB's definition of its prime rate. However, defendants maintain that loans without prepayment privileges are not the benchmark commercial loans with which a bank's prime rate is associated. They explain that prepayment privileges significantly affect the allocation of risks associated with changing interest rates. Thus, Mr. Grayheck's affidavit indicates that, as used in the commercial banking business, the phrase "90–day unsecured commercial loans" refers to loans with prepayment privileges (Grayheck aff. ¶¶ 8–9). According to defendants, that is the meaning the phrase was intended to have in the loan agreements executed by the plaintiffs. Therefore, defendants argue, plaintiffs are not entitled to discovery on loans without prepayment privileges and the case can be decided on the basis of the materials now before the court.

Plaintiffs respond that the phrase "90–day unsecured commercial loans" is too precise for interpretation. The court disagrees. The phrase is not meaningless but neither is it so precise as to rule out the interpretation advanced by the defendants. *Cf. Kleiner v. First National Bank*, 581 F.Supp. at 958–60 (promissory note provision setting the interest rate based on "the rate charged by [the] bank from time to time to its best Commercial borrowers with respect to ninety (90) day borrowings (the 'Prime Rate')" required interpretation). Mr. Grayheck asserts in his affidavit that the trade usage of the phrase excludes loans without prepayment privileges and that ANB's use of the phrase is consistent with that usage.[5] Plaintiffs have sub-

---

**4.** Defendants also justify their failure to produce documents pertaining to these commercial loans because the loans are of a fixed duration and for a fixed rate. These justifications are not supported by Mr. Grayheck's affidavit and at this stage they must be rejected.

**5.** It is not necessary for ANB to establish the trade usage to succeed, but the court notes that its assertions of trade usage are uncontradicted. *Advance Mortgage Corp. v. Concordia Mutual Life Ass'n*, 135 Ill.App.3d 477, 482–83, 90 Ill.Dec. 225, 229–30, 481 N.E.2d 1025, 1029–30 (1st Dist.

1985) (uncontradicted assertions of trade usage of the term "servicing" held to be controlling). The critical issue is what the parties intended the phrase to mean. *See, e.g., Felbinger & Co. v. Traiforos*, 76 Ill.App.3d 725, 732, 31 Ill.Dec. 906, 911, 394 N.E.2d 1283, 1288 (1st Dist.1979) ("primary object of the construction of a contract is to give legal effect to the intention of the parties"); *see also, e.g., Clark v. General Foods Corp.*, 81 Ill.App.3d 74, 78, 36 Ill.Dec. 447, 451, 400 N.E.2d 1027, 1031 (3d Dist.1980), *quoting Kelly v. Carroll*, 223 Ill.App. 309, 315–16 (1st

mitted nothing to contradict either assertion.[6]

Jurisdiction in this action depends upon plaintiffs' RICO claim, and that claim requires proof of a scheme to defraud. It is not enough that plaintiffs think the phrase should be interpreted differently or thought that it was interpreted differently or even that some financial institutions defined similar terms somewhat differently.[7] To prevail, plaintiffs would need to establish that the phrase had a commonly understood meaning upon which they relied and that ANB defined it differently without so disclosing for the purpose of defrauding them. Plaintiffs do not even attempt to do so. Thus, defendants' failure to produce or analyze loans without prepayment privileges, including loans made through ANB's International Division, is no obstacle to summary judgment.

Plaintiffs' second contention is that the defendants are not entitled to summary judgment because their motion is based only on loans made during the three-year period in which the named plaintiffs held floating rate loans. The complaint specifically identifies several floating rate loans that were made by ANB to the named plaintiffs between 1979 and 1981. However, the complaint also contains class allegations. Plaintiffs further allege that "prior to and at the time of these loans" defendants defrauded plaintiffs and other borrowers by collecting interest based on a declared prime rate in excess of ANB's actual prime rate (complaint ¶ 15). The action is brought on behalf of the named plaintiffs and an as yet uncertified class of borrowers from whom ANB allegedly collected excessive interest payments on or after January 1, 1971.

Plaintiffs obtained their first "prime-plus" floating rate loan on February 15, 1979. Defendants maintain that plaintiffs cannot claim to have been injured before then. Plaintiffs disagree, but what they have in mind is unclear. If they mean to contend that ANB overcharged borrowers on floating rate loans for the period January 1, 1971 to February 15, 1979, then plaintiffs cannot be class representatives. Any claim they might have during that period is not a class claim, as plaintiffs paid fixed interest rates not explicitly tied to the "prime rate." There is some suggestion, in the memoranda, contrary to the class definition and the allegations of the complaint, that what plaintiffs have in mind is that the fixed rate was represented to be related to ANB's then prime rate and that, because the prime rate was overstated at the time, they paid a higher rate than they would have if the prime rate had been properly determined. It is difficult to discern even an individual fraud claim there, as plaintiffs agreed upon a specific rate which ANB could not thereafter change. They do not allege that ANB would have been willing to charge a lower rate or that they could have done better elsewhere. In any event, that is not the claim alleged and, even were such a claim alleged, that is hardly the stuff of a class action since it rests, ultimately, upon a claim of misrepresentations respecting individual transactions.

Alternatively, plaintiffs may mean to contend that they were promised loans with prime-plus interest rates beginning in 1971,

---

Dist.1921); *Fifteenth Ave. Christian Church v. Moline Heating & Constr. Co.,* 131 Ill.App.2d 7656, 769, 265 N.E.2d 405, 408 (3d Dist.1970) (custom and trade usage is admissible to explain or aid in the interpretation of a contract, but not to vary or contracdict its terms). What ANB reasonably intended by the phrase is independently significant in interpreting the loan agreement.

**6.** Plaintiffs claim they are entitled to take Mr. Grayheck's deposition on these matters. The court disagrees. There is no reason why plaintiffs could not have submitted an affidavit from Harold Roman, who has some experience in the banking business (including reviewing proposed commercial loans in his capacity as a director of the Upper Avenue National Bank betwen 1976 and 1981), or from some other person who is familiar with the commercial banking industry.

**7.** Those facts may support breach of contract claims by the named plaintiffs and the class they seek to represent. However, without the RICO claims this court has no subject matter jurisdiction over such pendent state claims. *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

but they did not receive them. But plaintiffs' claims are not based on ANB's failure to carry out promises to make loans, rather, plaintiffs allege that ANB collected excessive interest charges on the loans that it actually made. Thus the court rejects this theory because it is not supported by the plaintiffs' complaint either.

At trial, the named plaintiffs would have the burden of proving that a scheme to defraud existed and that they were injured by it. The materials submitted by the defendants tend to refute both of these essential elements of the named plaintiffs' claims. Plaintiffs have submitted nothing to show that there is a genuine issue as to either of them, and under Fed.R.Civ.P. 56(e), they are not entitled to rest on their pleadings. The record now before the court shows that defendants are entitled to summary judgment on the named plaintiffs' claims. *See, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. ——, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. ——, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *P.H. Glatfelter Co. v. Voith, Inc.,* 784 F.2d 770, 774 (7th Cir.1986) (affirming summary judgment for defendant on fraud claims).

### III. Rule 56(f)

■ Plaintiffs argue that if the record now before the court shows that defendants are entitled to summary judgment, it is only because plaintiffs have not obtained enough discovery to oppose the motion. Plaintiffs seek relief under Rule 56(f) of the Federal Rules of Civil Procedure, which provides:

> Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Plaintiffs also argue that summary judgment is inappropriate where a motion to compel discovery is outstanding. However, to avoid summary judgment, plaintiffs must show that the discovery they seek would enable them to show that a genuine issue of material fact exists for trial. *See, e.g., Korf v. Ball State University,* 726 F.2d 1222, 1230 (7th Cir.1984); *Lamb's Patio Theatre, Inc. v. Universal Film Exchanges, Inc.,* 582 F.2d 1068, 1070–71 (7th Cir.1978); *see also Etshokin v. Texasgulf, Inc.,* 612 F.Supp. 1212, 1216 (N.D. Ill.1984).

■ Plaintiffs state that additional discovery will include obtaining certain computer tapes, obtaining the notes, memoranda and correspondence resulting from meetings at which ANB set its prime rate and other interest rates on various loans, and taking the depositions of at least 25 persons (Hartunian aff. ¶ 22). But they do not need this discovery to contradict defendants' interpretation of "90–day unsecured commercial loans." They could have done that by showing that the trade usage is inconsistent with defendants' usage. None of that information is within the exclusive possession or control of the defendants. Plaintiffs have submitted absolutely nothing to show that a triable issue exists concerning the meaning of this phrase. Therefore, their attack on the scope of defendants' analysis, *i.e.,* the exclusion of loans without prepayment privileges and loans processed through ANB's International Division, fails.

Nor is further discovery necessary to attack defendants' method of analyzing the 12,500 documents produced so far. Plaintiffs maintain they are entitled to defendants' computer tapes to save time and to ensure greater accuracy in analyzing the proffered data. Ordinarily they would be entitled to such tapes. *See, e.g.,* Fed.R. Civ.P. 34(a); *National Union Elec. Corp. v. Matsushita Elec. Industrial Co.,* 494 F.Supp. 1257, 1261–62 (E.D.Pa.1980) (collecting cases). Here, however, defendants have submitted an affidavit by Roger D. DeGroot, who is responsible for ANB's data processing operations, indicating that the computer tapes requested would be of marginal usefulness (defendants' reply mem. exh. 2). First, loan information was not stored on tape until October 1979. The bank used machine-readable punchcards be-

fore that, but those cards were discarded and the information on them was never transferred to any other machine-readable media.

After October 1979, ANB installed a new computer system. That system produces a "cumulative transactions file" which ANB stores on tape. But although that file contains loan data going back to 1979, the system automatically purges loan information from the file three months after final bills and statements have been sent. The tape of that file would appear to be incomplete for that reason.

Furthermore, the tape apparently does not contain information that would enable a user to segregate loans by term, or to differentiate between secured and unsecured loans. Therefore, while the tape seems to contain information about 90–day unsecured commercial loans, it would not be very helpful because a user could not separate those loans from other commercial loans. The computer system produces an "obligation master file" and an "obligor master file" that contain enough information to allow such an analysis. Those files are created daily and stored on tape, but because the tapes are only kept for a month, they also would be of very limited usefulness.

Plaintiff submitted the affidavit of John Sorto, a data processing expert who states that Mr. DeGroot's characterization of the tape is inconsistent with the documentation for ANB's computer system. However, Mr. DeGroot acknowledges in his affidavit that ANB's tapes are inconsistent with the system documentation. This inconsistency would be troubling, except the record shows that defendants conducted all of their production and analysis manually at their own expense of over $30,000. The court is not persuaded that plaintiffs are entitled to relief under Rule 56(f) based on defendants' failure to produce computer tapes.

Plaintiffs also argue that they need further discovery to fully analyze the documents already produced. Although the record shows that ANB has produced some documentation showing the general use of the various data fields on the loan registers and data entry sheets, plaintiffs maintain they need more. However, the only specific problem they identify is defendants' failure to explain a box designated "prime # " on the data entry sheets. Plaintiffs assume that the box contains prime rate designations, assert that the data entry sheets appear to accommodate 99 different prime rates, and point out that at least five different codes appear in the "prime # " box on the data entry sheets produced so far.

Plaintiffs presume that these codes designate interest rates other than ANB's announced prime rate. It is possible they are correct. But assuming they are, that fact alone would not alter defendants' conclusion that ANB was not charging less than its announced prime rate on its 90–day unsecured commercial loans. Plaintiffs could have resisted defendants' summary judgment motion in two ways. Given the support for defendants' motion, plaintiffs had to show there was a triable issue on either or both of the following:

1) whether the 579 loans analyzed by the defendants were the wrong loans; or

2) whether defendants' method of determining interest rates on the loans it analyzed incorrectly overstated those rates.

Plaintiffs have not explained how prime rate codes would be useful in making either showing and it is not apparent that they would be. No matter how many different codes ANB used on its data entry sheets, and no matter what those codes meant, if ANB was not charging less than its announced prime rate to its largest most creditworthy customers on their 90–day unsecured commercial loans, the named plaintiffs cannot prove their claim. Plaintiffs are not entitled to relief under Rule 56(f) based on defendants' alleged failure to produce documentation concerning the "prime # " data field.

The named plaintiffs must prove that there was a discrepancy between ANB's actual prime rate and its announced prime rate to succeed on any of their claims. The materials submitted by the defendants establish that they cannot do so, and plain-

tiffs have submitted nothing to show that a triable issue exists on this point. Discovery in this case has already been extensive and expensive. Plaintiffs have submitted nothing to suggest that ANB's interpretation is contrary to established and well understood trade usage, although it was well within their power to do so if such were the fact. Their contention that further discovery might lead to finding some infirmity in the ANB analysis of its loans is, at best, speculation having no foundation in the wealth of material previously produced. Plaintiffs are not entitled to relief under Rule 56(f). Defendants are entitled to summary judgment.

## IV. Other Matters

Plaintiffs argue that their motion for class certification must be decided before defendants' motion for summary judgment. Federal Rule of Civil Procedure 23(c)(1) requires a court to rule on class certification "as soon as practicable," and that frequently means class certification issues should be decided before any dispositive motions. *See, e.g., Watkins v. Blinzinger,* 789 F.2d 474, 475–76 n. 3 (7th Cir.1986); *see also Glidden v. Chromalloy American Corp.,* 808 F.2d 621 (7th Cir.1986) (grant of summary judgment on the merits in suit brought as class action not an appealable final order where class certification issue was still pending). But that is not an inflexible rule:

> In some situations ... dispositive motions may appropriately be decided before class certification is considered. For example, the defendants may be clearly entitled to dismissal of a class complaint under Rule 12 or 56, and investigation into the matters bearing on Rule 23 would be costly and time-consuming. Not surprisingly in view of the difficulties a contrary conclusion would produce, pre-certification consideration of the merits of the case has been upheld as within the court's power. The basic rationale is

that members of the putative class are not harmed in a "losing" case by pretermission of the issue of certification and that, by filing the motion before a ruling on the class issues, the defendant has waived the additional protection that would have been afforded by a judgment against the class.

*Manual for Complex Litigation (Second),* § 30.11 at 210 (1985) (footnotes omitted). In this case, the court believes that plaintiffs' motion for certification and defendants' motion for summary judgment can and should be decided simultaneously. Since defendants are entitled to summary judgment on the named plaintiffs' claims, the motion for certification must be denied. *See, e.g., East Texas Motor Freight System, Inc. v. Rodriguez,* 431 U.S. 395, 403, 97 S.Ct. 1891, 1896, 52 L.Ed.2d 453 (1977) ("a class representative must be part of the class and 'possess the same interest and suffer the same injury as the class member' ").[8]

Plaintiffs also contend, based on Judge Decker's remarks in open court, that only the issue of whether defendants' motion is timely, rather than the merits of the motion, is now before this court. However, the transcript of Judge Decker's remarks does not support that contention. Judge Decker simply stated that plaintiffs were free to raise the timeliness issue, not that it was the only issue presented:

> THE COURT: You have covered some wide territory and at the moment I am,— at least, I'm faced with a brief that has been filed here and I will let you address yourself to that brief.
>
> MR. HARTUNIAN: May I, your Honor, file a response showing why the defendants' motion should not go forward then—
>
> THE COURT: I say you can address yourself to that and you're doing that now, orally.
>
> But I think you had better spend a little more time with that.

---

8. Defendants state that they do not seek a judgment binding on the members of the alleged class (Defendants' Reply Mem. at 3 n. 2). *See also Simmons v. Drew,* 716 F.2d 1160 (7th Cir. 1983); *Roberts v. American Airlines, Inc.,* 526

F.2d 757, 762–63 (7th Cir.1975); *Peritz v. Liberty Loan Corp.,* 523 F.2d 349, 354 n. 4 (7th Cir. 1975); *Ahne v. Allis-Chalmers Corp.,* 102 F.R.D. 147 (E.D.Wis.1984).

MR. HARTUNIAN: I will, your Honor.
THE COURT: And if you want to do it simply on the basis that it's premature, you have [a] right to say so. . . .

*See* Plaintiff's Surreply in Opposition to Motion for Summary Judgment, Exh. 1.

### CONCLUSION

Defendants' motion for summary judgment is granted. Plaintiffs' motion to compel discovery is denied. Plaintiffs' motion to set a briefing schedule on their motion to certify a class is also denied.